No. 24-50630

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**PAUL RUSESABAGINA, TACIANA MUKANGAMIJE, ANAISE UMUBYEYI KANIMBA, AIMEE-LYS RUSESABAGINA, CARINE ISERE KANIMBA, AIME-DIANE RUSESABAGINA, TRESOR RUSESABAGINA, AND ROGER RUSESABAGINA,**
*PLAINTIFFS-APPELLANTS*

V.

**GAINJET AVIATION, S.A.,**
*DEFENDANT-APPELLEE*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS
Civil Action No. 5:20-1422

## BRIEF FOR PLAINTIFFS-APPELLANTS

STEVE D. SHADOWEN
HILLIARD SHADOWEN LLP
1717 W. Sixth Street, Suite 290
Austin, Texas 78703
Telephone: (835) 344-3298
***ATTORNEY OF RECORD FOR APPELLANTS***

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. Paul Rusesabagina
2. Taciana Mukangamije
3. Anaise Umubyeyi Kanimba
4. Aimee-Lys Rusesabagina
5. Carine Isere Kanimba
6. Aime-Diane Rusesabagina
7. Tresor Rusesabagina
8. Roger Rusesabagina
9. Steve Shadowen, Counsel for Plaintiffs-Appellants
10. Tina Miranda, Counsel for Plaintiffs-Appellants
11. Nicholas Shadowen, Counsel for Plaintiffs-Appellants
12. Marion Reilly, Counsel for Plaintiffs-Appellants
13. David F Knapp, Counsel for Defendant-Appellee
14. Andrew Harakas, Counsel for Defendant-Appellee
15. GainJet Aviation, S.A., Defendant-Appellee
16. Constantin Niyumwongere, named defendant in Original Complaint
17. Fouad Alghanim & Sons Group of Companies, parent company of Defendant-Appellee GainJet Aviation, S.A.
18. Hicks Davis Wynss, P.C., Counsel for Defendant-Appellee
19. Clyde & Co. US LLP, Counsel for Defendant-Appellee
20. Hilliard Martinez Gonzales LLP, formerly Counsel for Plaintiffs-Appellants
21. Hilliard Shadowen LLP, Counsel for Plaintiffs-Appellants
22. Martinez Reilly PLLC, Counsel for Plaintiffs-Appellants


*/s/ Steve D. Shadowen*
**STEVE D. SHADOWEN**
HILLIARD  SHADOWEN LLP

1717 W. Sixth Street, Suite 290
Austin, Texas 78703
Telephone: (835) 344 3298
***ATTORNEY OF RECORD FOR APPELLANTS***

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This appeal arises from an international kidnapping in which the plotters lured a San Antonio resident from the safety of his Texas home to the nightmare of a Rwandan prison cell. The appeal requires the Court to analyze these facts under its personal-jurisdiction precedents regarding the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984), and its "conspiracy jurisdiction" line of cases. The appeal also implicates the significant public interests of Texas and of the United States, because foreign regimes and their accomplices increasingly are reaching into the United States to physically abduct or lure citizens and lawful residents outside this nation's protections.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ 2

STATEMENT REGARDING ORAL ARGUMENT .................................................... 4

TABLE OF AUTHORITIES .............................................................................. 7

STATEMENT OF JURISDICTION ...................................................................... 1

STANDARD OF REVIEW ................................................................................ 2

STATEMENT OF THE CASE ............................................................................. 5

    A.      Procedural Background ...................................................... 5

    B.      Statement of the Facts ....................................................... 9

SUMMARY OF THE ARGUMENT ................................................................... 19

ARGUMENT ............................................................................................... 21

I.     GAINJET IS SUBJECT TO JURISDICTION BECAUSE IT
      COMMITTED INTENTIONAL TORTS IN TEXAS AND CAUSED
      SUBSTANTIAL HARM IN TEXAS TO A TEXAS LAWFUL
      RESIDENT. .......................................................................... 23

    A.      *Calder* and Its Progeny Are Determinative. ...................... 24

    B.      The District Court Misapplied the Facts to the Law. ........... 28

II.    CONSPIRACY JURISDICTION IS VIABLE IN THIS CIRCUIT,
      AND THE COURT SHOULD TAKE THIS OPPORTUNITY TO
      SAY SO CLEARLY. .............................................................. 38

    A.      The Court Has Not Categorically Rejected Conspiracy
         Jurisdiction. ................................................................... 39

    B.      GainJet's Participation In the Conspiracy Establishes a Prima
         Facie Case for Personal Jurisdiction ................................. 44

III.   EXERCISING PERSONAL JURISDICTION OVER GAINJET IS
       FAIR AND REASONABLE. ..............................................................47

       A.   Exercising Jurisdiction Over GainJet Upholds Fair Play and
            Substantial Justice. ...................................................................48

       B.   Asserting Personal Jurisdiction Advances Legitimate Interests
            and Ensures Accountability. ....................................................51

CONCLUSION .........................................................................................55

CERTIFICATE OF SERVICE .....................................................................57

CERTIFICATE OF COMPLIANCE ...........................................................58

# TABLE OF AUTHORITIES

**Cases**

*Ainsworth v. Moffett Eng'g, Ltd.*,
  716 F.3d 174 (5th Cir. 2013) ................................................................20

*Aitken v. Commc'ns Workers of Am.*,
  496 F. Supp. 2d 653 (E.D. Va. 2007) ....................................................34

*Alpine View Co. Ltd. v. Atlas Copco AB*,
  205 F.3d 208 (5th Cir. 2000) ................................................................21

*Bentley v. Halliburton Oil Well Cementing Co.*,
  174 F.2d 788 (5th Cir. 1949) ................................................................23

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*,
  582 U.S. 255 (2017) ..............................................................................21

*Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels., Div. of Occupational Safety &
  Health of the State of California*,
  1 F.4th 346 (5th Cir. 2021) ..............................................................2, 29

*Bullion v. Gillespie*,
  895 F.2d 213 (5th Cir. 1990) ................................................................27

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................26, 43, 45, 47

*Bus. Info. Sys. v. Pro. Governmental Research & Solutions, Inc.*,
  2002 WL 32747668 (W.D. Va. Oct. 10, 2002) ....................................34

*Calder v. Jones*,
  465 U.S. 783 (1984) ........................................................................passim

*Central Freight Lines Inc. v. APA Transport Corp.*,
  322 F.3d 376 (5th Cir. 2003) ............................................................2, 29

*Charles Schwab Corp. v. Bank of America Corp.*,
  883 F.3d 68 (2d Cir. 2018) ....................................................................40

*Christie v. Nat'l Inst. for Newman Stud.*,
  258 F. Supp. 3d 494 (D.N.J. 2017) ......................................................34

*Cole v. Tobacco Inst.*,
  47 F. Supp. 2d 812 (E.D. Tex. 1999) ....................................................34

*Delta Brands Inc. v. Danieli Corp.*,
  99 F. App'x 1 (5th Cir. 2004) ..........................................................37, 38

*Facebook, Inc. v. ConnectU LLC*,
  2007 WL 2326090 (N.D. Cal. Aug. 13, 2007) ....................................33

*Fed'n of State Massage Therapy Boards v. Mendez Master Training Ctr., Inc.*,
  2018 WL 534540 (S.D. Tex. Jan. 24, 2018) ....................................37, 38

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  592 U.S. 351 (2021) ....................................................................21, 25, 35

*Guidry v. U.S. Tobacco Co., Inc.*,
  188 F.3d 619 (5th Cir. 1999) ..........................................................passim
*Hardy v. Scandinavian Airlines Sys.*,
  117 F.4th 252 (5th Cir. 2024) ......................................................46, 47
*Indianapolis Colts, Inc. v. Metro. Balt. Football Club*,
  34 F.3d 410 (7th Cir. 1994) ..................................................................33
*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*,
  326 U.S. 310 (1945) ..............................................................................45
*Iowa v. Rimmer*,
  877 N.W.2d 652 (Iowa 2016) ................................................................34
*Jenkins v. Pooke*,
  2009 WL 10692010 (N.D. Cal. July 13, 2009), *report and recommendation
  adopted*, 2009 WL 10691375 (N.D. Cal. Aug. 19, 2009) ......................34
*Jones v. Dirty World Entertainment Recordings, LLC*,
  766 F. Supp. 2d 828 (E.D. Ky. 2011) ....................................................34
*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
  115 F.3d 1020 (D.C. Cir. 1997) .............................................................40
*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) ..............................................................................35
*Latshaw v. Johnston*,
  167 F.3d 208 (5th Cir. 1999) ................................................................20
*Levin v. Harned*,
  304 F. Supp. 2d 136 (D. Mass. 2003) ....................................................35
*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ....................................................33
*McFadin v. Gerber*,
  587 F.3d 753 (5th Cir. 2009) ............................................................42, 45
*Melea, Ltd. v. Jawer SA*,
  511 F.3d 1060 (10th Cir. 2007) .............................................................40
*Nuovo Pignone, SpA v. Storman Asia M/V*,
  310 F.3d 374 (5th Cir. 2002) ................................................................39
*Pace v. Cirrus Design Corp.*,
  93 F.4th 879 (5th Cir. 2024) ................................................................21
*Panda Brandywine Corp. v. Potomac Elec. Power Co.*,
  253 F.3d 865 (5th Cir. 2001) ....................................................20, 21, 39
*Paul Rusesabagina v. The Republic of Rwanda*,
  No. 22-00469 (D.D.C) ............................................................................6
*Pecoraro v. Sky Ranch for Boys, Inc.*,
  340 F.3d 558 (8th Cir. 2003) ................................................................43
*Pedelahore v. Astropark, Inc.*,
  745 F.2d 346 (5th Cir. 1984) ................................................................47

*Pervasive Software Inc. v. Lexware GmbH & Co. KG,*
  688 F.3d 214 (5th Cir. 2012) ....................................................20
*Pugh v. Socialist People's Libyan Arab Jamahiriya,*
  290 F. Supp. 2d 54 (D.D.C. 2003)............................................34
*Rusesabagina v. Republic of Rwanda,*
  2023 WL 2562692 (D.D.C. Mar. 16, 2023), *appeal dismissed,* 2023 WL 3029734
  (D.C. Cir. Apr. 14, 2023)..........................................................40
*Sangha v. Navig8 ShipManagement Private Ltd.,*
  882 F.3d 96 (5th Cir. 2018) ......................................................38
*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC,*
  22 F.4th 103 (2d Cir. 2021) ......................................................41
*Seiferth v. Helicopteros Atuneros, Inc.,*
  472 F.3d 266 (5th Cir. 2006) ....................................................45
*Simon v. Mullgrav,*
  2021 WL 4024360 (D.V.I. Sept. 1, 2021) ................................43
*Strabala v. Zhang,*
  318 F.R.D. 81 (N.D. Ill. 2016) .................................................36
*Texas v. Volkswagen AG,*
  669 S.W.3d 399 (Tex. 2023) ..............................................32, 41
*Textor v. Bd. of Regents of N. Illinois Univ.,*
  711 F.2d 1387 (7th Cir. 1983) ............................................40, 41
*TravelJungle v. Am. Airlines, Inc.,*
  212 S.W.3d 841 (Tex. App. 2006) ...........................................33
*United Techs. Corp. v. Mazer,*
  556 F.3d 1260 (11th Cir. 2009) ................................................40
*Unspam Techs., Inc. v. Chernuk,*
  716 F.3d 322 (4th Cir. 2013) ....................................................40
*Walden v. Fiore,*
  571 U.S. 277 (2014) ........................................................24, 30, 31
*Wal-Mart Stores, Inc. v. Rodriguez,*
  92 S. W.3d 502 (Tex. 2002) ......................................................22
*Wien Air Alaska, Inc. v. Brandt,*
  195 F.3d 208 (5th Cir. 1999) ..............................................32, 45
*Wilson v. Belin,*
  20 F.3d 644 (5th Cir. 1994) ......................................................39
*WorldVentures Holdings, LLC v. Mavie,*
  2018 WL 6523306 (E.D. Tex. Dec. 12, 2018) .........................37
*World-Wide Volkswagen Corp. v. Woodson,*
  444 U.S. 286 (1980) .................................................................41

**Statutes**
18 U.S.C. § 2520 .........................................................................6

28 U.S.C. § 1291 ....................................................................................1
28 U.S.C. § 1331 ....................................................................................1
28 U.S.C. § 1332 ....................................................................................1

## Other Authorities

Executive Order on Bolstering Efforts to Bring Hostages and Wrongfully Detained
    United States Nationals Home, White House, July 19, 2022. ..................................49

Restatement (Second) of Torts § 875 (1979) .............................................................23

## Rules

Tex. Civ. Prac. & Rem. Code § 17.042 .....................................................................41

## STATEMENT OF JURISDICTION

This case originated in the U.S. District Court for the Western District of Texas, San Antonio Division. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(a)(2), and 1350.

This Court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal from a final judgment issued by the district court, which dismissed all claims against all parties for lack of personal jurisdiction. The district court entered final judgment on June 27, 2024, and all Appellants timely filed a notice of appeal on July 26, 2024.

## STANDARD OF REVIEW

The standard of review for a district court's dismissal for lack of personal jurisdiction is de novo. *See Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 380 (5th Cir. 2003). Where, as here, the district court did not conduct an evidentiary hearing on the motion to dismiss, the party asserting jurisdiction need only present sufficient facts to establish a prima facie case supporting jurisdiction. *Id.* The court must resolve factual disputes in favor of the party invoking the court's jurisdiction and draw all reasonable inferences from those facts in favor of jurisdiction. *Id.*; *Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels., Div. of Occupational Safety & Health of the State of California*, 1 F.4th 346, 352 (5th Cir. 2021) (jurisdictional analysis conducted by "[a]ccepting the facts as [the plaintiff] tells them and drawing reasonable inferences therefrom").

## STATEMENT OF THE ISSUES

The complaint alleges that Defendant GainJet Aviation, S.A., a Greece-based charter aviation firm, participated in a plot to kidnap international human-rights activist Paul Rusesabagina from his home in San Antonio and unlawfully rendition him to Rwanda. There he was tortured, subjected to a show trial, and imprisoned for 31 months, eventually gaining release only at the insistence of the U.S. Secretary of State. Plaintiffs allege that GainJet agreed to provide false flight information, committing to inform Mr. Rusesabagina that GainJet would transport him from Dubai to Burundi while in fact delivering him from Dubai to Rwanda. The plotters used that false flight information to lure Mr. Rusesabagina out of his home in San Antonio, thereby committing torts of fraud and false imprisonment against Mr. Rusesabagina, and injuring him, in Texas.

The district court concluded that "much of the jurisdictional evidence suggests that GainJet was aware of or agreed to participate in the kidnapping." ROA.1157 (R.E.Tab.2).[1] The court nevertheless dismissed Plaintiffs' complaint on the asserted ground of lack of personal jurisdiction over GainJet.

---

[1] Record Excerpt, Tab 2.

The issues on appeal are:

1.    Under *Calder v. Jones*, 465 U.S. 783 (1984) and its progeny, a court has personal jurisdiction over a defendant that committed an intentional tort and injured the plaintiff in the forum. The question on appeal is whether the district court has personal jurisdiction over GainJet, which agreed to provide false flight information that, as GainJet knew and intended, the plotters used to lure Mr. Rusesabagina from his home.

2.    Even if personal jurisdiction were not established under the *Calder* test, Plaintiffs contend that GainJet would still be subject to jurisdiction for having joined a conspiracy whose very purpose and effect was to lure Mr. Rusesabagina from the sovereign territory and legal protections of Texas. The question on appeal is whether the district court erred in concluding that, despite the specific facts of this case, this Court has categorically precluded jurisdiction based on participation in a conspiracy, contrary to the conclusions of the other Courts of Appeals that have addressed the issue.

## STATEMENT OF THE CASE

### A.    Procedural Background

This case arises from the kidnapping, false imprisonment, and unlawful rendition of Paul Rusesabagina by Defendant GainJet Aviation, S.A. and its co-conspirators, including the Republic of Rwanda. Mr. Rusesabagina is an international human rights activist and outspoken critic of Rwandan President Paul Kagame. The complaint asserts that Kagame, with the knowledge and active participation of Defendant GainJet, kidnapped Mr. Rusesabagina from his home in San Antonio, Texas on the false pretext that after he flew to Dubai via commercial airlines GainJet would transport him from Dubai to speaking engagements in Burundi. ROA.251-52. Having provided the false flight information that it would transport Mr. Rusesabagina to Burundi, GainJet instead delivered him to Rwanda.

Mr. Rusesabagina, along with his wife and children, filed suit in the Western District of Texas on December 14, 2020, against GainJet and Constantin Niyumwongere, another participant in the kidnapping plot, asserting claims under Texas state law and alleging violations of international law. ROA.28.

On November 15, 2021, Plaintiffs filed an Amended Complaint, voluntarily dismissing their claims against Defendant Niyumwongere, having been unable to serve him with process. ROA.190-191; ROA.192.

On February 22, 2022, Mr. Rusesabagina and his family filed a separate suit against Kagame and other Rwandan officials in the U.S. District Court for the District of Columbia. As amended, that complaint asserted claims under state law and for violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2520, the Torture Victim Protection Act, 28 U.S.C. § 1350 note, and the Alien Tort Statute, 28 U.S.C. § 1350. ROA.981, ROA.1044-1063 (Plaintiffs' Amended Complaint, *Paul Rusesabagina v. The Republic of Rwanda*, No. 22-00469, ECF 17 (D.D.C.)).

On June 14, 2022, GainJet moved to dismiss the complaint in this case on the ground that the court lacked subject matter jurisdiction and personal jurisdiction, that the complaint failed to state a claim for relief, and that the Act of State doctrine barred Plaintiffs' claims. ROA.277.

After briefing on GainJet's motion to dismiss was completed, the district court granted Plaintiffs leave to conduct limited jurisdictional discovery. ROA.12 (R.E.Tab.1). Specifically, the court's minute order provided Plaintiffs 90 days to conduct the discovery and authorized a Rule 30(b)(6) deposition of GainJet's corporate representative. ROA.12 (R.E.Tab.1).

At a February 24, 2022 status conference, the district court clarified that Plaintiffs could pursue "limited jurisdictional discovery on the sole issue with regard to this specific flight that when Mr. Rusesabagina was invited did GainJet know about that initial invitation; did GainJet have anything to do from him

getting to San Antonio, Texas to Dubai; what, if anything, the Rwandan government gave to GainJet with regard to the Dubai charter, all those kind of limited things…" ROA.1183. The court specifically prohibited Plaintiffs from getting discovery "directed to GainJet employees' awareness of the conspiracy to kidnap Mr. Rusesabagina rather than any purposeful contacts with the state of Texas." ROA.1151 (R.E.Tab.2).

On April 15, 2022, Plaintiffs deposed GainJet's corporate representative, Captain Ramsey Shaban Khdair. ROA.632.

On June 6, 2022, Plaintiffs moved to compel a re-deposition of Mr. Khdair and to take additional depositions. ROA.619. Plaintiffs argued that defense counsel had improperly instructed Mr. Khdair not to answer questions relevant to establishing GainJet's minimum contacts with Texas. ROA.622. The district court denied the motion on November 29, 2022. ROA.843.

On March 24, 2023, due to efforts by U.S. Secretary of State Antony Blinken and international human rights organizations, the Republic of Rwanda released Mr. Rusesabagina after two and a half years of captivity, allowing him to reunite with his family in San Antonio.

Shortly after, on March 31, 2023, Mr. Rusesabagina and his family voluntarily dismissed their claims against Kagame and the Rwandan government in the District of Columbia.

On May 18, 2023, Plaintiffs moved to transfer venue in this case to the District of Columbia under 28 U.S.C. § 1404(a). ROA.926. During oral argument on the motion, which took place on July 11, 2023, GainJet's counsel contended that Texas was the proper forum, emphasizing that "all the contacts point to Texas." ROA.1215.

The district court denied Plaintiffs' motion to transfer on July 28, 2023. ROA.1132.

On June 27, 2024, the district court entered final judgment, dismissing all claims against GainJet for lack of personal jurisdiction. ROA.1161 (R.E.Tab.3). The court "agree[d] with Plaintiffs that much of the jurisdictional evidence suggests that GainJet was aware of or agreed to participate in the kidnapping." ROA.1157 (R.E.Tab.2). The court nevertheless concluded that "GainJet's intent to kidnap Mr. Rusesabagina does not establish purposeful contacts with Texas or with the United States as a whole." ROA.1157 (R.E.Tab.2).

Appellants, Mr. Rusesabagina and all other Plaintiffs,[2] timely filed their notice of appeal on July 26, 2024. ROA.1162 (R.E.Tab.4).

---

[2] For ease of reference, this brief focuses on Plaintiff Paul Rusesabagina. The personal jurisdiction analysis is not different for any of the other Plaintiffs, all of whose injuries result from Mr. Rusesabagina's abduction from Texas.

## B. Statement of the Facts

**Mr. Rusesabagina Becomes a Critic of Kagame**

In 1994, as genocide ravaged Rwanda, Mr. Rusesabagina transformed the Hôtel des Milles Collines in Kigali into a sanctuary, sheltering 1,268 Tutsis and moderate Hutus fleeing the Interahamwe militias. ROA.240. Amid the chaos, while the country burned, no one inside the hotel was harmed or killed—in large part because of Mr. Rusesabagina's extraordinary courage. ROA.240. His heroic actions inspired the critically acclaimed film *Hotel Rwanda*, which brought global attention to his story and to the Rwandan tragedy. ROA.240. In 2005, President George W. Bush awarded to Mr. Rusesabagina the Presidential Medal of Freedom, the highest civilian honor bestowed by the United States. ROA.241.

After rising to international prominence for his conduct during the Rwandan genocide, Mr. Rusesabagina became a sharp critic of the post-genocide government in Rwanda. ROA.241. What followed was a long and bitter standoff between Mr. Rusesabagina and Rwandan President Kagame, rooted in Mr. Rusesabagina's outspoken condemnation of Kagame and his human rights abuses. ROA.241-251. Mr. Rusesabagina's public denunciations, combined with his involvement in opposition groups, marked him as a political threat to Kagame's regime. ROA.241-251.

**GainJet Joins the Plot**

Mr. Rusesabagina continued to live and work in Rwanda through 1996, when he barely escaped an assassination attempt. ROA.249; ROA. 829. He then moved abroad, vowing never to return to Rwanda. ROA.829 ("As a result of this ongoing intimidation and attacks, I had not returned to Rwanda in 17 years, and had no intention of traveling there"). He began splitting his time between Belgium, where he is a citizen, and his home in San Antonio, where he is a lawful permanent resident of the United States. ROA.202. From abroad, he continued to be a leader in the opposition to the Kagame regime (now in its 24th year in power), and suffered continual surveillance, harassment, and threats. ROA.241-251.

In 2020 Kagame, frustrated at his inability to reach and silence Mr. Rusesabagina from afar (Kagame had routinely assassinated or imprisoned other opposition leaders) orchestrated Mr. Rusesabagina's kidnapping and rendition to Rwanda. The plotters included Kagame, Rwandan security agents, Constantin Niyomwungere—a self-proclaimed religious Bishop and, unbeknownst to Mr. Rusesabagina, a Rwandan government agent—and defendant GainJet, a Greece-based charter jet corporation. ROA.251-252.

Kagame knew that Mr. Rusesabagina would never voluntarily return to Rwanda, where he feared that he, like so many other of Kagame's political foes,

would be imprisoned or killed. ROA. 829. So, he would have to be lured out of the United States and into Rwanda under false pretenses. ROA.266-69.

Enter GainJet.

Looking to expand GainJet's business, its chief executive officer, Mr. Khdair, had by 2016 developed a close business relationship with Kagame and his regime. ROA.254-55. A GainJet spokesperson explained that "[w]e've established an office in Rwanda. … We're focusing on Rwanda and fly to Kigali quite often; we may permanently base [another] aircraft there, a Challenger." ROA.254-55. (In fact, GainJet did base the Challenger in Rwanda, and later used it in the kidnapping plot.) ROA.252.

GainJet frequently provided charter flights for Rwandan government officials, and it boasted about Kagame being among its customers. ROA.255. And the business ran both ways—Kagame transferred his planes from South Africa to Greece, where GainJet is located. ROA.255.

The kidnapping plot was straightforward. GainJet's agreed participation was twofold: (1) it would deliver Mr. Rusesabagina from Dubai to Rwanda; and (2) it would tell him that the flight was going not from Dubai to Rwanda, but from Dubai to Burundi. ROA.198; ROA.267. GainJet's false flight information was a cornerstone of the plot to lure Mr. Rusesabagina out of his home forum under false pretenses. *Id*.

Before putting the plot in motion, Kagame and the other co-conspirators had to be assured that GainJet would provide the false flight information. The entire scheme would unravel if at any time before takeoff GainJet's employees had made any statement inconsistent with the false flight information, *i.e.*, had uttered the truth that the flight was going to Rwanda. An offhand remark, an accurate itinerary, a truthful passenger ticket, a flight announcement, or a comment about the weather in Kigali would have caused the scheme to collapse. So, there would have been no point in putting the plot in motion if GainJet had not committed *at the outset* to providing the false flight information. GainJet's commitment—to provide the false flight information and to in fact deliver Mr. Rusesabagina to Rwanda rather than Burundi—came at the plot's inception, when Mr. Rusesabagina was safely at his home in San Antonio.[3]

Armed with GainJet's commitment to the false flight information, in 2020 co-conspirator Niyomwungere contacted Mr. Rusesabagina at his home in San Antonio, inviting him to travel to Burundi, falsely asserting that he would be giving speeches at churches about the Rwandan genocide. ROA.251. They maintained contact via WhatsApp, with conversations centering around the trip, while Mr. Rusesabagina was still residing in Texas. ROA.251; ROA.829. Given

---

[3] GainJet admits that it was contacted by the Republic of Rwanda about providing the flight at least six weeks before the August 27, 2020 flight. ROA.308.

GainJet's participation in the plot from its inception, the complaint alleges that GainJet knew and intended that Mr. Rusesabagina would receive the false flight information—about GainJet's own chartered flight—*while Mr. Rusesabagina was in Texas*. ROA.267 ("Defendant GainJet and the other co-conspirators intentionally misled Mr. Rusesabagina by providing him with a false itinerary, causing him to believe he would be travelling to Burundi.").

With Niyomwungere acting as the intermediary, Mr. Rusesabagina agreed to the proposed speaking tour in Burundi. ROA.198. He would fly via commercial airline from San Antonio to Chicago on August 26, 2020 and then on from there to Dubai, again on a commercial airline. ROA.252. Then on August 27, 2020 he would take the chartered GainJet flight from Dubai to (he believed) Burundi. ROA.252. Niyomwungere was also a passenger on the GainJet flight with Mr. Rusesabagina. ROA.199; ROA.800 (R.E.Tab.5). Unbeknownst to Mr. Rusesabagina, the Republic of Rwanda had paid GainJet for the charter flight. ROA.253.

**GainJet Covers Its Tracks**

Later events confirmed GainJet's deep commitment to and participation in the plot. At least nine days before Mr. Rusesabagina left Texas, the GainJet aircraft sat on the tarmac awaiting his arrival in Dubai. Either directly or through an intermediary, GainJet communicated with Mr. Rusesabagina about the flight while he was in Texas. GainJet CEO Khdair twice admitted by affidavit that GainJet

obtained a copy of Mr. Rusesabagina's passport "two to three days prior to the flight." ROA.309; ROA.553. Mr. Rusesabagina was in Texas at that time. ROA.252; ROA.829.[4] GainJet needed the passport copy in order to fly out of Dubai. ROA.644, 647.

As noted by the district court, "[GainJet's] charter agreement requires passenger names to be forwarded to GainJet at least 48 hours in advance of departure in order to provide the information to immigration authorities in a timely manner and requires that passengers be issued tickets." ROA.1135. According to GainJet, it did not issue any ticket to Mr. Rusesabagina. ROA.642-43; ROA.846. A truthful ticket would have caused the scheme to implode; a false one would have left documentary evidence of GainJet's participation in this international kidnapping.

During the nine-day wait on the tarmac, GainJet also switched its flight crew without updating the flight manifest—yet another breach of standard aviation protocol. ROA.648; ROA.1150 (R.E.Tab.2).

In discovery, Plaintiffs demanded to examine the cell phone of GainJet's Operations Manager, Ms. Fedra Pergialotti. ROA.658. She had used the phone to coordinate the flight paperwork with Niyomwungere or with another Rwandan

---

[4] Apparently realizing the import of his twice-previously-sworn testimony as to the timing of this communication—the fact that it occurred while Mr. Rusesabagina was in Texas—Mr. Khdair attempted to walk it back at his deposition. ROA.642, 654. That attempt is to no avail where, as here, all evidence is construed in favor of Plaintiffs.

agent, John Paul, with whom she was also in contact. ROA.647, 651. One or both of them may have been in Texas during these phone calls. ROA.655 (Q. Do you know where John Paul was located when Fedra was communicating with him? A. No, I don't. Q. Do you know if he was in Texas? A. I don't know where he was). GainJet failed to produce the phone, asserting that it had been "damaged" and replaced—after this lawsuit began—and is now lost. ROA.649; ROA.1150-51 (R.E.Tab.2).

## GainJet Delivers Mr. Rusesabagina to Rwanda

When Mr. Rusesabagina arrived in Dubai, GainJet adhered to its commitment, made at the outset, to provide false flight information to Mr. Rusesabagina and to transport him to Rwanda rather than Burundi. Before takeoff, Mr. Rusesabagina chatted with the GainJet pilot, Alexandros Karpouzis. ROA.799 (R.E.Tab.5). Mr. Rusesabagina asked him "how many hours does it take from here to Bujumbura? (capital of Burundi)," and Alexandros replied that it would take around three and a half hours. ROA.799 (R.E.Tab.5). The GainJet flight attendant also referred to the flight going to Bujumbura. ROA.800 (R.E.Tab.5). As Niyomwungere later testified at the show trial in Rwanda, "[m]yself, the pilot and cabin crew knew we were coming to Kigali. The only person who didn't know where we were headed was Paul." ROA.199; ROA.253. As Kagame himself later crowed in a televised nationwide address, "It (the plan) was actually flawless!" ROA.199.

Once the plane landed, Mr. Rusesabagina realized he was at the Kigali airport, not Burundi, and he began screaming for help. ROA.254. Despite his pleas, no GainJet crew came to his aid. Rwandan security agents then boarded the GainJet aircraft, blindfolding, gagging, and hogtying Mr. Rusesabagina—all in plain sight of the GainJet flight crew. "All of them saw me. All of them saw me," Mr. Rusesabagina has testified. ROA.805-06 (R.E.Tab.5). Yet again no one intervened. Instead, the GainJet pilot scoffed "good luck" as the agents dragged Mr. Rusesabagina off the plane. ROA.806 (R.E.Tab.5) ("like a tree trunk, they were pulling me on the ground like a tree trunk"). The agents hauled him across the tarmac before shoving him into a waiting vehicle. ROA.254; ROA.806 (R.E.Tab.5).

**GainJet Needs No Investigation, So It Conducts None**

GainJet's actions following the kidnapping further underscore its central participation. Despite the international outcry and scrutiny that erupted after Mr. Rusesabagina's abduction, GainJet remained silent, offering no explanation or justification for the glaring irregularities surrounding the flight or for how it came to be involved in the unlawful rendition.

GainJet did not conduct *any* internal investigation or even so much as interview the flight crew or any of its employees. *See* ROA.636. Its CEO Khdair testified during his deposition that he "can't remember" whether he even asked the GainJet pilot or flight attendant about the events on board, despite all the

international press coverage and the filing of this lawsuit. ROA.625. Mr. Khdair admitted that GainJet never spoke to *anyone* or asked *anyone* about the allegations in the complaint, on the asserted ground that "there is nothing really [to] look into. Everything was normal." ROA.625. Likewise, when asked whether the captain, Alexandros, saw Mr. Rusesabagina being bound on board the aircraft, Mr. Khdair replied: "He came and said the flight was normal." ROA.625.

There is a good reason for GainJet's otherwise inexplicable failure to conduct an investigation or even interview the flight crew. GainJet did not need an investigation—it already knew the who, what, where, when, why, and how of its participation in the kidnapping plot.

**The District Court Overlooks GainJet's False Flight Information**

The district court drew many of the obvious conclusions from these facts. "[T]he Court agrees with Plaintiffs that much of the jurisdictional evidence suggests that GainJet was aware of or agreed to participate in the kidnapping." ROA.1157 (R.E.Tab.2); *see also* ROA.1158 (R.E.Tab.2) ("GainJet employees may have deceived Mr. Rusesabagina by misrepresenting his destination while he was in Dubai."); ROA.1150 (R.E.Tab.2) ("several pieces of information …, together with the allegations in the Amended Complaint, suggest that GainJet may have been both aware of and a willing participant in the conspiracy to kidnap Mr. Rusesabagina").

But the court found no personal jurisdiction over GainJet on the ground that "there is no reason to believe that GainJet itself had any role in convincing Mr. Rusesabagina to leave the United States." ROA.1157 (R.E.Tab.2). As we establish in detail below, that erroneous conclusion resulted from the court's singular focus on the (admittedly dramatic) events in Dubai and Kigali. The court altogether neglected the lynchpin to the whole plot—GainJet's agreement *at the outset* to provide the false flight information, *i.e.,* GainJet's commitment to tell Mr. Rusesabagina that it would transport him to Burundi but would in fact deliver him to Rwanda.

That false flight information is what the plotters used to lure Mr. Rusesabagina out of the safety of his San Antonio home.

# SUMMARY OF THE ARGUMENT

The district court had personal jurisdiction over GainJet on each of two independently sufficient grounds. Plaintiffs satisfied the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984), which permits personal jurisdiction where the defendant commits a tort, and causes injury, in the forum. GainJet pledged at the outset of the plot to provide false flight information to Mr. Rusesabagina, knowing that others would transmit that information to him.

Under *Calder*, it is inconsequential that others, rather than GainJet, transmitted the false information into Texas. Those circumstances parallel the fact pattern in *Calder* itself, where the writers crafted the libelous article in Florida, but the publisher, not the defendant writers, sent it into California. The district court here erred in altogether ignoring the role of GainJet's false flight information in luring Mr. Rusesabagina out of Texas. The court instead focused exclusively on GainJet's later, additional tortious conduct in Dubai and Rwanda.

The district court also seemed to require that GainJet know that Mr. Rusesabagina was being lured specifically out of Texas, as opposed to out of Belgium. This was error on the facts and the law. On the facts, GainJet's full and deep participation in the plot allows the inference that GainJet knew the plot's basic elements, including Mr. Rusesabagina's location. The district court erred in failing to afford Plaintiffs all reasonable inferences on this issue. Moreover, on the law, it

is irrelevant whether GainJet knew the location of the tort and the injury. An intentional tortfeasor that purportedly is ignorant of the victim's location, but proceeds to commit the intentional tort anyway, assumes the risk of being haled into court wherever the tort and consequent injury in fact occur.

Even if personal jurisdiction did not exist under *Calder*, jurisdiction would be justified, on these specific facts, based on GainJet's participation in a conspiracy whose very purpose and effect was to kidnap a lawful Texas resident from his Texas home. The district court refused to analyze GainJet's conduct in the context of the conspiracy, erroneously concluding that this Court has categorically precluded personal jurisdiction based on participating in a conspiracy. The Court has not in fact erected such an absolute barrier, and doing so would create a Circuit split. Instead, the Court has consistently required an intensive analysis of the facts of each case, and those facts here include GainJet's deep and essential participation in a conspiracy to kidnap a Texas resident from Texas.

On these facts, the district court has personal jurisdiction over GainJet, and this Court should reverse and remand for further proceedings.

# **ARGUMENT**

"A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (quoting *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999)). Regarding the first prong, "[t]he Texas long-arm statute states that a nonresident is considered to be doing business in the state—and therefore is subject to personal jurisdiction—if it 'commits a tort in whole or in part in [Texas].'" *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 229 (5th Cir. 2012) (quoting statute).

"Exercising personal jurisdiction over a nonresident defendant is consistent with due process," and meets the second prong, "when '(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice.'" *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867 (5th Cir. 2001) (quoting *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000)). The requisite "minimum contacts" can be established "either through contacts sufficient to assert specific jurisdiction, or contacts

sufficient to assert general jurisdiction." *Id*. at 867-68 (quoting *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000)).

Plaintiffs here contend that the district court has specific jurisdiction over GainJet. "[S]pecific jurisdiction exists when a defendant purposefully avails itself of the privilege of conducting activities within a forum state, the plaintiff's claims arise out of or relate to the defendant's 'minimum contacts,' and maintaining the suit would not offend traditional notions of fair play and substantial justice." *Pace v. Cirrus Design Corp*., 93 F.4th 879, 900 (5th Cir. 2024) (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–60 (2021)). "Or put just a bit differently, 'there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Ford Motor Co*., 592 U.S. at 359–60 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017) (other quotations and citations omitted)).

Plaintiffs established GainJet's minimum contacts with Texas, under two lines of cases.

## I.   GAINJET IS SUBJECT TO JURISDICTION BECAUSE IT COMMITTED INTENTIONAL TORTS IN TEXAS AND CAUSED SUBSTANTIAL HARM IN TEXAS TO A TEXAS LAWFUL RESIDENT.

The lynchpin to the kidnapping plot here was GainJet's commitment, at the outset of the scheme, that it would tell Mr. Rusesabagina that it was transporting him to Burundi but would in fact deliver him to Rwanda. Without GainJet's commitment to this false flight information *at the outset*, there would have been no point in devising and implementing the plot—one careless word by the crew about the flight's true destination would have toppled the scheme.

That false flight information, and GainJet's commitment to it, were tortious conduct. *See, e.g.*, *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S. W.3d 502, 507 (Tex. 2002) ("False imprisonment's first element may [ ] be satisfied by conduct that is intended to cause one to be detained, and in fact causes the detention, even when the actor does not participate in the detention."). And GainJet obviously knew that the false flight information would be communicated to Mr. Rusesabagina—concocting false flight information has no point unless it is communicated to the passenger. GainJet knew he would receive the false flight information long before he left home. And GainJet itself communicated with Mr. Rusesabagina in Texas, either directly or indirectly, to get a copy of his passport.

On these facts, GainJet is subject to personal jurisdiction in Texas, where GainJet's false flight information was in fact communicated to its intended victim.

## A.    *Calder* and Its Progeny Are Determinative.

Putting aside the fact of a conspiracy (see Section II below), the independently tortious conduct of each of GainJet, the Republic of Rwanda, and Niyomwungere combined to cause a single indivisible injury to Mr. Rusesabagina in Texas. Regardless of any conspiracy among them, each of the tortfeasors is liable under traditional causation principles for materially contributing to that injury in Texas.[5] And the Supreme Court held in just these circumstances that such an out-of-forum tortfeasor whose wrongful conduct contributes to the tort and injury in the forum is subject to personal jurisdiction there. *Calder v. Jones*, 465 U.S. 783, 791 (1984).

In *Calder* the defendants, a writer and editor (the "writers"), wrote a libelous article in Florida about actor Shirley Jones, who resided in California and was injured by the article there. The writers were not involved in publishing the article; rather, it was a publisher who circulated the story into California. The Supreme Court nevertheless concluded that the California courts had personal jurisdiction over the writers as well as the publisher.

A number of elements led to that holding. Their conduct was "calculated to cause injury." *Id*. at 791. Moreover, their "intentional, and allegedly tortious, actions

---

[5] *See, e.g.*, *Bentley v. Halliburton Oil Well Cementing Co*., 174 F.2d 788, 793 (5th Cir. 1949) ("Although there was no concert of action between the tort-feasors, the cumulative effect of their several acts was a single, indivisible injury which certainly would not have resulted but for the concurrence of such acts. In these circumstances, the actors may be held liable as joint tort-feasors."); Restatement (Second) of Torts § 875 (1979) (same).

were expressly aimed at California" because the article was aimed at Ms. Jones, and she lived and worked in California. *Id*. at 789–90. And Ms. Jones in fact experienced the "effects" of their conduct in California. Considering these factors, "[i]n sum, California [wa]s the focal point both of the story and of the harm suffered." *Id*. at 789.

*Calder* did not require the writers to have personally established physical contact with California; it required only that their conduct, in combination with that of other tortfeasors, materially contributed to a single indivisible harm in California. This is made clear by this Court's decision in *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619 (5th Cir. 1999), where tobacco trade associations wrote articles for and placed ads in national publications. *Guidry* noted that "[t]he Supreme Court [in *Calder*] emphasized that the Florida journalists had intentionally aimed their economic and emotionally harmful conduct *at the California resident*." *Id*. at 629 (emphasis added). It was sufficient that the writers knew that their conduct "would have a potentially devastating impact upon the [plaintiff]," and that the "injury would be felt by respondent in the State in which she lives and works." *Id*. (quoting *Calder*, 465 U.S. at 789-90).

*Guidry* noted that neither of the writers in *Calder* personally sent the offending publication into California. Their only wrongful conduct—writing and editing the offending article—occurred entirely in Florida. 188 F.3d at 628-629. It was

sufficient that they knew that their wrongful conduct would combine with that of others to cause injury in California. They knew "that the article involved a California resident and that it would be distributed there, [bringing] them within the jurisdiction of the court because they knowingly had engaged in tortious activity outside the state that had an effect in the forum state." *Id.*; *see also Walden v. Fiore*, 571 U.S. 277, 287 (2014) (noting that libel requires publication, that the writers in *Calder* played no role in publishing the article in California, and that the writers' and the publisher's combined conduct caused the injury in California). Neither *Calder* nor *Guidry* refers to this combined-conduct effects test as "conspiracy jurisdiction," and to the extent the district court here did so (ROA.1147) or conflated those two independent ways of establishing personal jurisdiction, it erred.

The Supreme Court's subsequent decision in *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021), powerfully reinforces this analysis. Ford sold cars to customers outside Montana, who then re-sold the cars into Montana, where they crashed. The Court noted that specific jurisdiction exists over a defendant when the claim "arise[s] out of *or relate[s] to*" the defendant's conduct. *Id.* at 362 (emphasis in original). The Court expressly rejected the notion that the defendant's in-state conduct must have caused the in-state injury. *Id.* (rejecting argument that jurisdiction requires "proof that the plaintiff's claim came about because of the defendant's in-state conduct").

Instead, what mattered was that Ford's negligent out-of-state conduct related to the in-state injury, and that Ford could reasonably foresee that the injury would occur there. Ford could have "'structure[d] [its] primary conduct' to lessen or even avoid the costs of state-court litigation." *Id*. at 368.

*Calder* and its progeny are determinative here.

GainJet specifically aimed its tortious conduct at Mr. Rusesabagina. He was the intended, specifically targeted victim of GainJet's intentional tort, and was (and is) a lawful, permanent resident of Texas. So, it was anything but "random, fortuitous, or attenuated," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 486 (1985) (citations omitted), that he was injured in Texas. Texas is the jurisdiction where Mr. Rusesabagina received GainJet's fraudulent flight information, and it is the jurisdiction from which he was lured. And, like the plaintiff in *Calder*, his home jurisdiction is where the tort in fact injured him.

The facts here are even stronger than those in *Calder*. Unlike the mere libel that the *Calder* defendants committed, GainJet's torts more intensely implicated the forum state's own sovereign interests. GainJet lured Mr. Rusesabagina out of Texas's physical sovereign territory. In doing so, GainJet also offended Texas's legal sovereignty—the essence of GainJet's tort of false imprisonment (kidnapping) was removing Mr. Rusesabagina from the legal protections that the sovereign state of Texas provided. GainJet's conduct circumvented Mr. Rusesabagina's having

specifically sought a safe haven in Texas. And GainJet itself communicated with Mr. Rusesabagina in Texas to get a copy of his passport.

### B.    The District Court Misapplied the Facts to the Law.

#### 1.    The court applied the wrong facts.

The district court did not directly apply the facts to the *Calder* framework. To the extent the court discussed the facts in the context of the conspiracy analysis (addressed below in Section II), the court ignored the facts that are among the most pertinent to the *Calder* analysis.

As noted in detail above, GainJet's tortious conduct had two aspects: (1) providing fraudulent flight information to be transmitted to Mr. Rusesabagina, and (2) transporting him to Rwanda rather than Burundi, and making additional misrepresentations to him at that time. The district court erroneously focused exclusively on the latter. The court discussed only GainJet's transporting of Mr. Rusesabagina and its misrepresentations to him while on the tarmac in Dubai. That conduct was indeed tortious. But the court altogether ignored GainJet's prior tortious conduct that lured Mr. Rusesabagina out of Texas and into Dubai—supplying the fraudulent flight information that Mr. Rusesabagina relied on *in Texas*.

Relatedly, the district court seemed to require that GainJet itself either physically enter Texas or directly itself send its fraudulent flight information into Texas. *See* ROA.1157 (R.E.Tab.2). But "[i]t is well settled that specific jurisdiction

may arise without the nonresident defendant's ever stepping foot upon the forum state's soil." *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990). And *Calder* precludes the notion that GainJet must itself have personally sent the false information into Texas. The writers in *Calder* did not send the libelous article into California; the publisher did. *Guidry* emphasized exactly that aspect of *Calder*. 188 F.3d at 791. Here, GainJet committed at the outset to the false flight information, and Niyomwungere delivered that information to Mr. Rusesabagina—as GainJet agreed, knew, and intended. ROA.198, 267.

### 2. The court erred in analyzing GainJet's knowledge that Mr. Rusesabagina was in Texas.

The district court seemed to conclude that Plaintiffs failed to show that GainJet knew that it was helping to lure Mr. Rusesabagina from Texas specifically, and that they were required to make such a showing. *See* ROA.1157 (R.E.Tab.2). The court erred in both respects.

The facts here show that GainJet was fully and deeply involved in this kidnapping plot. It committed at the outset to provide the false flight information that was the lynchpin to luring Mr. Rusesabagina from his home. It kept the plane waiting on the tarmac in Dubai for nine days; violated its charter agreement by not issuing a passenger ticket; violated protocol by not updating the flight manifest when it changed crew; replaced and cannot produce the mysteriously "damaged" phone

that GainJet used to communicate with Niyomwungere and another Rwandan agent, one or both of whom may have been in Texas; got a copy of Mr. Rusesabagina's passport from him while he was in Texas; repeatedly made good on its longstanding commitment to provide false flight information to Mr. Rusesabagina in Dubai; ignored his pleas for help when Rwandan security forces entered the plane in Kigali; stood by as he was blindfolded, gagged, and hogtied on the plane; reacted by scoffing "good luck"; and, despite the international press attention and outcry, conducted no investigation of the matter, with its CEO purportedly unable to remember whether he even asked the pilot or crew what happened.

The complaint alleges that GainJet was a full and knowledgeable participant in the plot, including knowing that Mr. Rusesabagina would receive the tortious false flight information *while he was in Texas*. ROA.267-68. That conclusion is fully supported by the overwhelming evidence of GainJet's participation in the plot, by the "damaged" phone that would reveal any direct communication into Texas, by the communication into Texas to get the passport copy, and by GainJet's shabby attempts at denial in this case. The conclusion is surely justified when all the allegations and evidence are construed, as they must be, in the light most favorable to Plaintiffs. *See, e.g.*, *Bulkley*, 1 F.4th at 350; *Central Freight Lines*, 322 F.3d at 380.

Regardless, such a showing is not required under *Calder*. The libelous article in *Calder* targeted *the plaintiff*, Ms. Jones, not California. The record included no evidence that the writers sought out a victim in California or even cared that Ms. Jones was in California. California was important only in that her presence there was not transient or fortuitous—it was her home. The writers "aimed" their conduct at California in the sense that they aimed it at Ms. Jones and she was non-fortuitously in California. Intentional tortfeasors like those writers and GainJet cause injuries in particular states not because they target the states, but because they specifically direct their intentional torts at victims while they are in those states. *See Guidry*, 188 F.3d at 629 ("[t]he Supreme Court [in *Calder*] emphasized that the Florida journalists had intentionally aimed their economic and emotionally harmful conduct at the California resident").

Thus, the district court erroneously concluded that GainJet's conduct did not relate to "contacts that the 'defendant himself' creates with the forum State." ROA.1154 (R.E.Tab.2) (quoting *Walden*, 571 U.S. at 284). Under the effects test, contributing to a tort in the state and causing injury there *are the required minimum contacts*. *See, e.g., Guidry*, 188 F.3d at 629 ("under *Calder*, the effects of torts committed outside the forum state that cause death or serious physical harm may also serve as minimum contacts with the forum for purposes of personal jurisdiction").

This is confirmed by the Supreme Court's later decision in *Walden*, which held that "[t]he crux of *Calder*" was that the "tort actually occurred in California." 571 U.S. at 287-88. The defendant's *knowledge* that its intentional tort would occur in and have its effects in the specific forum was *not* the crux.

The district court misapplied *Walden* because it repeated its mistake of ignoring that GainJet committed torts against and injured Mr. Rusesabagina in Texas. The district court concluded that "GainJet's misrepresentation to Mr. Rusesabagina *in Dubai* is not a contact with Texas or the United States, but with a person who happens to reside there." ROA.1158 (R.E.Tab.2) (emphasis added). But targeting Mr. Rusesabagina—a Texas resident—and providing false flight information to be transmitted to him, and thereby *committing a tort against him in Texas, and injuring him in Texas*, surely *are* contacts with Texas. So too is the communication to get the passport copy from him in Texas, which was necessary for the flight to leave Dubai.

In *Walden*, a Georgia police officer committed a tort (an unreasonable search and seizure) against a Nevada resident while she was traveling through a Georgia airport. *Walden* found no personal jurisdiction in Nevada because defendant's only meaningful contact with the forum was that the plaintiff lived there. 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum").

Here, in contrast, GainJet specifically targeted a Texas resident for kidnapping, and committed torts against him and injured him in Texas. Indeed, GainJet's conduct further "is tethered to [Texas] in [a] meaningful way" (571 U.S. at 290-21) because the very essence of the torts was physically removing Mr. Rusesabagina from the sovereign territory and legal protection of his Texas home.

*Walden* reinforces, rather than undermines, *Calder*'s holding: a non-resident defendant's independent conduct, when combined with a third party's conduct that physically reaches into the state to cause a single indivisible injury, suffices for personal jurisdiction over the non-resident defendant.

### 3. The court erred in holding that Mr. Rusesabagina's potential presence in Belgium negated jurisdiction in Texas.

The district court concluded that "it was equally foreseeable to GainJet that the effects of its tortious conduct would be 'felt' in Belgium [as in Texas]." ROA.1159 (R.E.Tab.2). As demonstrated above, that conclusion is erroneous: construed most favorably for Plaintiffs, their evidence shows that GainJet in fact knew that its fraudulent flight information was luring Mr. Rusesabagina specifically out of Texas. But GainJet would be subject to jurisdiction in Texas even if GainJet did not have that specific knowledge.

The district court drew exactly the wrong conclusion from any ambiguity as to whether GainJet knew the specific locale from which its false flight information

would lure Mr. Rusesabagina. If there were any such ambiguity, the conclusion would not be that GainJet should be free from jurisdiction in both Belgium and Texas. The right conclusion would be that GainJet in effect assumed the risk of where its torts would be consummated and cause injury, subjecting it to jurisdiction where the torts and consequent injuries in fact ultimately occurred. *See Texas v. Volkswagen AG,* 669 S.W.3d 399, 420 (Tex. 2023) ("conduct directed at other jurisdictions does not negate . . . purposeful availment of this one.") (cleaned up).

GainJet would not be the first intentional tortfeasor that, unsure (purportedly) of where its tort will be accomplished and cause injury, committed the wrongful acts despite that uncertainty. In *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999), defendant argued that he aimed his out-of-forum tortious communication to the plaintiff, and it was merely "fortuitous" that the plaintiff resided in Texas. The Court trenchantly rejected that argument: "If this argument were valid in the tort context, the defendant could mail a bomb to a person in Texas but claim Texas had no jurisdiction because it was fortuitous that the victim's zip code was in Texas. It may have been fortuitous, but the tortious nature of the directed activity constitutes purposeful availment." 195 F.3d at 213.

That rule applies whenever the intentional tortfeasor does not know the plaintiff's location but nevertheless commits an intentional tort against and injures him. Courts conclude that the defendant in effect assumed the risk as to the plaintiff's

location and is therefore subject to jurisdiction where the tort in fact occurred and caused injury. *See, e.g.*, *Indianapolis Colts, Inc. v. Metro. Balt. Football Club*, 34 F.3d 410, 411 (7th Cir. 1994) (Posner, J.) (applying *Calder* in a trademark suit and noting that "[b]y choosing a name that might be found to be confusingly similar" the defendant "assumed the risk of injuring valuable property located in" the forum); *TravelJungle v. Am. Airlines, Inc.*, 212 S.W.3d 841, 850 (Tex. App. 2006) ("[W]e do not believe that [defendant] should be able to avoid personal jurisdiction by purposefully engaging in activity directed towards a [computer] server located in a particular forum and then claiming ignorance of the location of that forum . . . the senders assumed the risk that they would be haled into a forum where that server is located."); *Facebook, Inc. v. ConnectU LLC*, 2007 WL 2326090, at *6 (N.D. Cal. Aug. 13, 2007) ("there is no dispute that [defendants] were fully aware that [plaintiff] existed, and that they specifically targeted their conduct against [plaintiff]," and it is irrelevant "[t]hat they were able to do so while remaining ignorant of [plaintiff's] precise location"); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) (foreign defendant that provided material support for state-sponsored terrorism is subject to personal jurisdiction in U.S. for death and injury to U.S. citizens, despite not even knowing which terrorist activities its money ultimately funded); *Iowa v. Rimmer*, 877 N.W.2d 652, 667 (Iowa 2016) ("persons engaged in multistate insurance fraud assume the risk of prosecution wherever those they

deceive are located. A contrary holding would impede the State's ability to prosecute and deter multistate insurance fraud schemes perpetrated on persons in Iowa"). Cases so holding are legion.[6]

Every consideration of policy and fairness—fairness to GainJet as well as to Plaintiffs—leads to the same conclusion. Limitations on personal jurisdiction exist to protect defendants from involuntarily litigating in remote forums with which their contacts are "random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 486 (internal quotation marks and citations omitted). If (counterfactually) GainJet did not know that its false flight information was luring Mr. Rusesabagina specifically out of Texas, it undoubtedly knew that its information was *luring him from wherever*

---

[6] *See also, e.g.*, *Bus. Info. Sys. v. Pro. Governmental Research & Solutions, Inc.*, 2002 WL 32747668, at \*6 (W.D. Va. Oct. 10, 2002) ("the fact of the matter is that [defendant] allegedly accessed the [plaintiff's] server, regardless of where it was located"); *Christie v. Nat'l Inst. for Newman Stud.*, 258 F. Supp. 3d 494, 506 (D.N.J. 2017) (allowing defendant to "claim ignorance" about plaintiff's location "and avoid personal jurisdiction would constitute a manifest injustice to [Plaintiff] and [the forum]") (internal quotation omitted); *Jones v. Dirty World Entertainment Recordings, LLC*, 766 F. Supp. 2d 828, 834-35 (E.D. Ky. 2011) (*Calder* test met because, wherever the location, "defendants knew that the invidious statements they posted would cause distress and harm to the plaintiff where she lived and/or worked"); *Jenkins v. Pooke*, 2009 WL 10692010, at \*4-5 (N.D. Cal. July 13, 2009), *report and recommendation adopted*, 2009 WL 10691375 (N.D. Cal. Aug. 19, 2009) (rejecting "the perverse effect of immunizing such conduct"); *Aitken v. Commc'ns Workers of Am.*, 496 F. Supp. 2d 653, 660 (E.D. Va. 2007) ("[a] contrary result would permit … tortfeasors to escape jurisdiction simply by turning a blind eye to the natural consequences of their actions"); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003) (defendants assumed the risk of being sued in terrorist victims' home forums because defendants "should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die"). Accord *Cole v. Tobacco Inst.*, 47 F. Supp. 2d 812, 815 (E.D. Tex. 1999) (rejecting argument that *Calder* test cannot be met "if [defendant's] intentional wrongdoing was aimed at more than one state" because such an outcome "goes against common sense. It implies that a party can avoid liability by multiplying its wrongdoing").

*he had freely chosen to be*—whether San Antonio, Belgium, or elsewhere. There is no evidence that GainJet conditioned its fraudulent flight information on Mr. Rusesabagina's being in a particular location or not being in San Antonio. GainJet provided the false flight information *regardless of where it would be transmitted to Mr. Rusesabagina*.

In these circumstances, it was clearly "reasonable" and "predictable" that GainJet would be subject to jurisdiction wherever its false information was communicated to Mr. Rusesabagina, including in Texas. GainJet could "structure its primary conduct" to avoid litigation in Texas by the simple expedients of: (a) not providing false flight information calculated to lure Mr. Rusesabagina from wherever he was; or (b) conditioning that information on Mr. Rusesabagina's not being in Texas. GainJet did neither. It therefore could "'reasonably anticipate being haled into [Texas's] court[s]' to defend actions 'based on' [its conduct] causing injury there.'" *Ford*, 592 U.S. at 364. (quoting *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 781 (1984)). The conclusion is particularly apt where, as here "the intentional tort was individually targeted at the resident of the forum state." *Levin v. Harned*, 304 F. Supp. 2d 136, 148 (D. Mass. 2003) ("[n]umerous courts" have so held).

GainJet intentionally targeted Mr. Rusesabagina for injury. Its intentional tort was consummated in Texas and injured Mr. Rusesabagina in Texas. Assuming that

GainJet did not *know* that its intentional tort would be completed and cause injury in Texas, then at a minimum it did not *care* where it was completed and caused injury.

Where an intentional tortfeasor ex ante does not care where the tort occurs or causes injury, no constitutional values require the courts to permit the tortfeasor ex post to care where it is called to account for that tort and injury. So assume it were true that GainJet did not know in advance whether its intentional torts against Mr. Rusesabagina, and consequent injury, would occur in Belgium or Texas (or elsewhere). The answer in those circumstances would not be that GainJet is thereby somehow immune from suit in both jurisdictions; the answer would be that it is subject to suit in whichever jurisdiction the tort and injury in fact ultimately occurred. A contrary conclusion would permit "a defendant [to] insulate himself from being sued anywhere except in his home state by choosing to remain ignorant of the locations of his victims." *Strabala v. Zhang*, 318 F.R.D. 81, 111 (N.D. Ill. 2016).

## II. CONSPIRACY JURISDICTION IS VIABLE IN THIS CIRCUIT, AND THE COURT SHOULD TAKE THIS OPPORTUNITY TO SAY SO CLEARLY.

As demonstrated above, personal jurisdiction exists under the *Calder* effects test based on GainJet's false flight information, which was tortious, which it knew and intended would be communicated to Mr. Rusesabagina and cause him injury, and which in fact was communicated to him, and caused him injury, in Texas. That

conclusion is based on GainJet's own conduct and its effects in Texas; it does not depend on the existence of any conspiracy or on imputing any co-conspirators' conduct or contacts to GainJet.

But of course GainJet was in fact a key participant in a conspiracy, which confirms the court's personal jurisdiction over GainJet.

GainJet was an active participant in a conspiracy in which its co-conspirators reached directly into Texas to lure Mr. Rusesabagina to Rwanda, resulting in the commission of complete torts—including fraud and false imprisonment—in Texas. Reports of the demise of conspiracy jurisdiction in this Circuit are overstated, and this case presents a valuable opportunity for the Court to clear up persistent confusion on this point among the district courts in this Circuit.

## A. The Court Has Not Categorically Rejected Conspiracy Jurisdiction.

Quoting one phrase from the unpublished opinion in *Delta Brands Inc. v. Danieli Corp.*, 99 F. App'x 1 (5th Cir. 2004), the district court here took the categorical view that "[t]he Fifth Circuit . . . does not recognize a 'conspiracy theory' of personal jurisdiction." ROA.1155 (R.E.Tab.2). More than one other district court in this Circuit has done the same. *See, e.g.*, *WorldVentures Holdings, LLC v. Mavie*, 2018 WL 6523306, at *10 (E.D. Tex. Dec. 12, 2018) (asserting that conspiracy jurisdiction cannot be applied in the Fifth Circuit); *Fed'n of State*

*Massage Therapy Boards v. Mendez Master Training Ctr., Inc.*, 2018 WL 534540, at *5 & n.9 (S.D. Tex. Jan. 24, 2018) (same) (collecting cases).

But the result in *Delta Brands*, like that in most personal jurisdiction cases, was based on a fact-intensive review of the plaintiff's specific allegations and their connection, if any, to the forum. Far from taking a categorical approach *against* conspiracy jurisdiction, *Delta Brands* entertains the idea that personal jurisdiction could be based on a defendant's "alleged participation in a conspiracy." *Delta Brands*, 99 F. App'x at 5-6. *Delta Brands* simply found that the allegations in that complaint did not tie the alleged conspiracy to the defendant's "contacts with Texas," and the plaintiff "provided no other evidence that the conspiracy was related to [the defendant's] contacts with Texas." *Id.* at 5.

Similarly, many district courts have cited *Guidry* for the proposition that jurisdiction can be based only on a defendant's "individual conduct, not as part of a conspiracy." *See Fed'n of State Massage Therapy Boards,* 2018 WL 534540, at *5 & n.9 (collecting cases). To the contrary, *Guidry* found jurisdiction under the *Calder* effects test and *expressly reserved* the question of conspiracy jurisdiction. *See Guidry*, 188 F.3d at 631 ("Accordingly, we need not consider or decide the complex issues of [conspiracy jurisdiction].").

Nor do any of this Court's other decisions, cited by the district court in a prior Order (ROA.843), categorically reject jurisdiction based on participating in a

conspiracy aimed at the forum. *See Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 103 (5th Cir. 2018) (no discussion of conspiracy jurisdiction; distinguishing *Calder* because the plaintiff could not establish anything more than injury in the forum); *Wilson v. Belin*, 20 F.3d 644, 649 (5th Cir. 1994) (no discussion of conspiracy jurisdiction; distinguishing *Calder* because "[h]ere, defendants did not execute a prearranged plan by initiating a communication to Texas aimed at a Texas resident," but instead "answered one uninitiated and unsolicited phone call" "while sitting unsuspectingly in their respective offices in Indiana and Iowa"); *Nuovo Pignone, SpA v. Storman Asia M/V,* 310 F.3d 374, 380 (5th Cir. 2002) (no discussion of conspirary jurisdiction, but finding the Italy-based defendant subject to jurisdiction because "[a]s a voluntary member of the economic chain that brought the reactor to Louisiana, Fagioli purposely has availed itself of the privilege of conducting business in that state"); *Panda Brandywine*, 253 F.3d at 869 (no discussion of conspiracy jurisdiction; rejecting personal jurisdiction when plaintiffs' "sole evidence" was a conclusory allegation that the defendant "knew its actions would intentionally cause harm . . . in Texas").

This Court's cases have not categorically rejected the principle that a defendant can be subject to personal jurisdiction in a forum based on participating in a conspiracy. This is an ideal case for the Court to apply that principle: GainJet joined a conspiracy the very purpose of which was to reach into Texas and physically

remove a lawful permanent resident from the state's protections. And GainJet itself communicated with Mr. Rusesabagina (directly or indirectly) to get required flight documents while he was in Texas.

The widely accepted standard for conspiracy jurisdiction asks whether plaintiffs have adequately alleged (1) a conspiracy, (2) that the defendant participated in the conspiracy, and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction. *See, e.g.*, *Charles Schwab Corp. v. Bank of America Corp.,* 883 F.3d 68 (2d Cir. 2018); *Unspam Techs., Inc. v. Chernuk,* 716 F.3d 322, 329 (4th Cir. 2013); *Rusesabagina v. Republic of Rwanda*, 2023 WL 2562692, at *6 (D.D.C. Mar. 16, 2023), *appeal dismissed*, 2023 WL 3029734 (D.C. Cir. Apr. 14, 2023) ("[A] court may assert jurisdiction over defendants outside the forum based on a co-conspirator's case-related contacts with the forum if the plaintiff pleads 'with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.'") (quoting *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997). *See also Textor v. Bd. of Regents of N. Illinois Univ.,* 711 F.2d 1387, 1392-1393 (7th Cir. 1983) (applying conspiracy jurisdiction and articulating the test as two elements: "plaintiff must allege both an actionable conspiracy and a substantial act in furtherance of the conspiracy performed in the forum state"); *Melea, Ltd. v. Jawer SA,* 511 F.3d 1060, 1069 (10th Cir. 2007)

(accepting the possibility that conspiracy jurisdiction may apply "in some cases"); *United Techs. Corp. v. Mazer,* 556 F.3d 1260, 1281-82 (11th Cir. 2009) (applying the test for conspiracy jurisdiction under Florida law).

The third prong of this test imputes a co-conspirator's forum-directed conduct, in furtherance of the conspiracy, to the defendant. *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC,* 22 F.4th 103, 125 (2d Cir. 2021). It ensures that a "conspiracy theory could not get off the ground if a defendant were altogether blindsided by its co-conspirator's contacts with the forum; the conspiratorial contacts must be of the sort that a defendant 'should reasonably anticipate being haled into court' in the forum as a result of them." *Id*. (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The Seventh Circuit has articulated a similar rationale, holding that "[t]he 'conspiracy theory' of personal jurisdiction is based on the 'time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy.'" *Textor*, 711 F.2d at 1392 (collecting cases).

Texas state law further supports this test. Under the Texas long-arm statute, one of the acts that constitutes "doing business" in the state is "commit[ting] a tort in whole or in part in this state." Tex. Civ. Prac. & Rem. Code § 17.042(2). And the Texas Supreme Court recently confirmed that jurisdictional contacts can be imputed to a foreign defendant when those contacts are part of an overarching tortious scheme

in which the foreign defendant used entities in Texas as its "boots on the ground" to complete the tort. *Texas v. Volkswagen*, 669 S.W.3d at 418.

### B. GainJet's Participation In the Conspiracy Establishes a Prima Facie Case for Personal Jurisdiction.

Personal jurisdiction turns on a fact-intensive review of the plaintiff's specific allegations and evidence. *See, e.g. McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) ("The 'minimum contacts' inquiry is fact intensive and no one element is decisive"). Here the facts and circumstances supporting jurisdiction over GainJet, individually and as part of the conspiracy, are overwhelming.

GainJet committed to the false flight information, which GainJet knew the co-conspirators would transmit to Mr. Rusesabagina, and which Niyomwungere did in fact transmit to him in Texas. GainJet itself communicated with Mr. Rusesabagina to get required paperwork while he was in Texas. GainJet later executed the second part of the scheme, reiterating the false flight information to Mr. Rusesabagina on the tarmac in Dubai, and then delivering him to Rwanda rather than the promised destination in Burundi. Having joined a conspiracy to kidnap Mr. Rusesabagina from his home forum, GainJet is hardly "altogether blindsided" by being called to account in the jurisdiction in which it participated in kidnapping him.

Many other specific factors support considering GainJet's conduct in the context of the conspiracy of which it was an essential part.

First, this is not a case in which a plaintiff invokes a conspiracy rubric as a threadbare cover for the absence of other evidence. Plaintiffs have made a preliminary factual showing that a conspiracy existed and that GainJet participated in it. The conspiracy is essentially a matter of public record, and the district court found that Plaintiffs' evidence shows "that GainJet was aware of or agreed to participate in the kidnapping." ROA.1157 (R.E.Tab.2).

Second, the conspiracy as a whole was directly aimed at Texas. Its very purpose was to secure the physical removal of Mr. Rusesabagina from Texas, through false pretenses. GainJet's co-conspirators directly conveyed GainJet's false flight information to Mr. Rusesabagina in Texas, and GainJet received travel documents from him while he was there. The conspirators' connections to Texas were anything but "random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 486.

Third, while this is a civil case, it uniquely implicates not only Mr. Rusesabagina's interests, but those of the state as well. The conspirators removed Mr. Rusesabagina from the state's sovereign territory and the legal protections it affords. The jurisdiction from which the victim is abducted undoubtedly has a significant sovereign interest in the matter, as the district court recognized. ROA.1160 (R.E.Tab.2) ("The Court agrees with Plaintiffs that both the State of Texas and the United States have a strong interest in preventing residents and citizens from being kidnapped and wrongfully detained in other jurisdictions."); *see*

*also, e.g.*, *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562-63 (8th Cir. 2003); *Simon v. Mullgrav*, 2021 WL 4024360, at *4 (D.V.I. Sept. 1, 2021); *Tanksley v. Rose*, 2019 WL 6709386, at *5 (E.D. Va. Dec. 9, 2019).

Fourth, Mr. Rusesabagina had specifically sought out Texas as a safe haven from Kagame, who had pursued him even in Belgium. ROA.829. Mr. Rusesabagina's presence in Texas was not "random" or "fortuitous"—he was (and is) a lawful permanent resident and lived and worked there, as he does now. ROA.202.

Fifth, the conspirators, including GainJet, committed torts in Texas and caused injury to Mr. Rusesabagina there. And, in furtherance of the scheme, GainJet communicated with Mr. Rusesabagina in Texas to get a copy of his passport.

Sixth, GainJet's participation in the conspiracy was essential and deep. As discussed in detail above, it provided the false flight information that was the conspiracy's lynchpin, reiterated that false flight information to Mr. Rusesabagina on the ground in Dubai, and delivered him to Rwanda instead of Burundi.

Seventh, Mr. Rusesabagina would not have voluntarily left Texas to travel to Rwanda. *Acting collectively*, the conspirators, including GainJet, reached into Texas and used the false flight information to secure his removal from the state's protections, and delivered him to Kagame's clutches in Rwanda.

Applying the commonly-accepted test for conspiracy jurisdiction in this case will serve the laudable purpose of providing needed guidance to the lower courts in this Circuit regarding the continued viability, in appropriate cases, of conspiracy jurisdiction. Doing so will also avoid creating an explicit circuit split that would invite forum shopping on jurisdictional issues.

## III. EXERCISING PERSONAL JURISDICTION OVER GAINJET IS FAIR AND REASONABLE.

GainJet has the requisite minimum contacts with Texas. The only remaining question is whether, despite those sufficient contacts, the district court's exercising jurisdiction would nonetheless offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).). Once a plaintiff has established minimum contacts, "the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc*., 472 F.3d 266, 271 (5th Cir. 2006).

The Court examines five factors: "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *McFadin*, 587 F.3d at 760. "These considerations sometimes serve

to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Guidry*, 188 F.3d at 631 (citing *Burger King*, 471 U.S. at 477). And "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Notably, "[i]t is rare to say the assertion is unfair after minimum contacts have been shown." *Wien Air Alaska*, 195 F.3d at 215.

GainJet can come nowhere near making the required showing.

### A. Exercising Jurisdiction Over GainJet Upholds Fair Play and Substantial Justice.

Unsurprisingly, GainJet expended little effort in the district court trying to prove that exercising jurisdiction would be unreasonable. *See* ROA.322; ROA.486. How could it possibly be unreasonable for a Texas court to exercise jurisdiction over a defendant that played a key role in kidnapping a Texas resident from Texas?

All of the relevant factors support jurisdiction.

GainJet operates internationally and regularly avails itself of U.S. and even Texas airspace. ROA.652.[7] So it can present no compelling reason why litigating in

---

[7] GainJet was not truthful in its initial affidavit to the court when it stated "GainJet does not conduct its business of carriage by air of passengers in Texas or the United States from premises leased or owned by the GainJet or by another carrier with which it has a commercial agreement." ROA.307.

Texas would pose an unreasonable burden. GainJet complains that the evidence is spread among the United Arab Emirates, Greece, Rwanda, and Belgium. ROA.302. But that just shows that the relevant evidence will be abroad no matter which forum hosts the litigation. That's what happens when a defendant joins a multinational kidnapping plot.

Moreover, the burden of international travel falls more lightly on an international airline firm, which "may be better able than many other defendants to mitigate the burden of litigating this case in the United States." *Hardy v. Scandinavian Airlines Sys.*, 117 F.4th 252, 267 (5th Cir. 2024). GainJet, like the defendant in *Hardy*, is an international airline and touts itself as providing services "worldwide." *See* ROA.428.

Texas has a profound interest in protecting its residents from foreign entities that fraudulently reach into the state to kidnap and torture its residents. This interest is only heightened when that harm is part of a coordinated, targeted conspiracy. *See, e.g.*, *Burger King*, 471 U.S. at 473 (state has a "'manifest interest' in providing its residents with a convenient forum for redressing injuries"); *See also Pedelahore v. Astropark, Inc.*, 745 F.2d 346, 349–50 (5th Cir. 1984) ("[o]ne factor which weighs

---

After Plaintiffs proved that GainJet's affidavit was false, GainJet admitted that it operated flights to Houston, Texas on at least one occasion, for Kagame himself. ROA.550.

heavily in this calculus is [the forum state's] interest in providing effective means of redress for its residents").

As Texas residents, Mr. Rusesabagina and his wife have a significant interest in obtaining convenient and effective relief through a single lawsuit in their home state, and their choice of forum is entitled to deference. *See, e.g., Hardy*, 117 F.4th at 268 (plaintiff "has a vested interest in being able to pursue her claim in the forum she has chosen, one where she will not be unduly inconvenienced if she wishes to attend any of the proceedings and where some of her experts may be more readily available").

A U.S. court, with its efficient discovery mechanisms and reliable system for administering civil litigation, best serves the administration of justice. Litigating the claims here will be efficient and fair for all parties.

Nor does any other jurisdiction have a greater interest than the United States in providing a forum for a victim who was lured out of the country as part of an international kidnapping plot. By finding jurisdiction over GainJet, the Court will reinforce a broader policy against impunity for international conspiracies targeting U.S. residents.

The defendant international airline's plea of inconvenience would be weak in any case. It vanishes into nothingness where the case arises from GainJet's key role in kidnapping a Texas resident from his home in Texas.

## B. Asserting Personal Jurisdiction Advances Legitimate Interests and Ensures Accountability.

The framework for personal jurisdiction rests on the principle of accountability, particularly in cases involving international torts. Denying jurisdiction here would not only weaken Texas's ability to protect its lawful residents; it would send the wrong message to foreign tortfeasors—that they can harm Texans in Texas without ever being called to answer in Texas courts. This Court's long-standing commitment to safeguarding state sovereignty and upholding the rule of law decisively supports the reasonableness of exercising jurisdiction. Texas's right to hold accountable those who intentionally target its residents is paramount, irrespective of where the tortfeasors reside.

The *means* by which GainJet abducted Mr. Rusesabagina should not obscure what happened here. GainJet and the plotters got control over Mr. Rusesabagina through false pretenses and misrepresentations. But ascertaining jurisdiction here is no different than if the kidnapping had occurred through more stark means—as if the plotters had accosted Mr. Rusesabagina in Texas at gunpoint and bound and gagged him in a burlap sack. So, who should have to travel to a distant jurisdiction to litigate this tort case? Mr. Rusesabagina, who was abducted from his home jurisdiction? Or GainJet, which was a key participant in the abduction?

And much more than Plaintiffs' personal interests is at stake. This case illustrates the increasingly transnational nature of intentional torts and the critical

need for the law to keep pace and provide a framework for assessing personal jurisdiction under similar facts. Absent a realistic and effective framework, savvy tortfeasors would be encouraged to engage in jurisdictional gamesmanship, sending impecunious shills—the Constantin Niyumwongeres of the world—into the U.S. to do the initial dirty work.

In July 2022, President Biden issued an Executive Order recognizing that wrongful detention of Americans abroad is a National Emergency. The Order reads:

> I therefore determine that hostage-taking and the wrongful detention of United States nationals abroad constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency to deal with this threat.[8]

The Government of Iran's attempts to kidnap Americans from U.S. soil is illustrated by the case of Brooklyn journalist Masih Alinejad, an outspoken critic of the Iranian regime. In a scheme perhaps taking inspiration from GainJet's here, Iranian intelligence agents attempted to lure Ms. Alinejad outside the United States, so she could be captured and transported to Iran. Fortunately, the FBI foiled the plan, and the foreign intelligence agents were indicted.[9]

---

[8] Executive Order on Bolstering Efforts to Bring Hostages and Wrongfully Detained United States Nationals Home, White House, July 19, 2022.

[9] FBI Press Release available at https://www.justice.gov/opa/pr/iranian-intelligence-officials-indicted-kidnapping-conspiracy-charges. U.S. Attorney Audrey Strauss said: "Among this country's most cherished freedoms is the right to speak one's mind without fear of government reprisal. A U.S. citizen living in the United States must be able to advocate for human rights without being targeted by foreign intelligence operatives." *Id.* FBI Assistant Director William F.

The transnational reach of intentional torts is also apparent in other contexts. In November 2022, the now-deceased Russian mercenary leader Yevgeny Prigozhin brazenly admitted to reaching into the United States and interfering in U.S. political elections. On Russian social media, he bluntly stated: "We have interfered [in U.S. elections], we are interfering, and we will continue to interfere. Carefully, accurately, surgically and in our own way, as we know how to do."[10]

Foreign governments, including Rwanda, have used corporations and other accomplices to target U.S. citizens inside this nation with spyware that monitors their cell phone usage and communications.[11] The FBI has warned that the Chinese government may use TikTok, a Chinese social media company, to reach into the U.S. and spy on American citizens.[12]

---

Sweeney Jr. also released a statement saying: "This is not some far-fetched movie plot. We allege a group, backed by the Iranian government, conspired to kidnap a U.S. based journalist here on our soil and forcibly return her to Iran." *Id*.

[10] Russia's Prigozhin admits interfering in U.S. elections, Reuters, November 7, 2022, https://www.reuters.com/world/us/russias-prigozhin-admits-interfering-us-elections-2022-11-07/.

[11] Stephanie Kirchgaessner, Hotel Rwanda activist's daughter placed under Pegasus surveillance, The Guardian, July 19, 2021, https://www.theguardian.com/news/2021/jul/19/hotel-rwanda-activist-daughter-pegasus-surveillance; Panel warns of spyware threats to human rights, rule of law, American Bar Association, August 10, 2022, https://www.americanbar.org/news/abanews/aba-news-archives/2022/08/panel-warns-of-spyware-threats/.

[12] Rachel Treisman, The FBI alleges TikTok poses national security concerns, NPR, November 17, 2022, https://www.npr.org/2022/11/16/1137076864/fbi-says-china-could-use-tiktok-to-spy-on-americans-including-government-workers.

All of these injuries feature multiple tortfeasors, many or all of whom know and intend that their conduct abroad will cause injury to U.S. residents in the United States. This Court should not approve a legal framework that would allow intentional tortfeasors to escape the jurisdiction of U.S. courts through the simple expedient of arranging for only one of them to physically (or electronically) reach into the United States.

Those who engage in conduct abroad knowing and intending that it will cause injury in the United States cannot be surprised, and are not unfairly treated, when they are found to be subject to personal jurisdiction where the tort and the injury occur. In contrast, U.S. residents injured in the United States by that intentional conduct would be surprised—shocked—to learn that, despite being injured in the United States while innocently minding their own business, they must try to seek justice in some far-flung jurisdiction on the ground that the tortfeasor lives there or set the tort in motion there.

Allowing GainJet to escape this forum's jurisdiction through jurisdictional gamesmanship would send a sinister signal to already emboldened foreign bad actors. The due process clause provides no refuge for foreign actors that target their intentional torts against U.S. residents in the United States. Texas and the United States have a profound interest in ensuring that their lawful residents can pursue justice without being forced into foreign courts. GainJet could—and should—have

anticipated being haled into court here for participating in a plot to kidnap a Texas resident from Texas and unlawfully rendition him into a prison cell 8,575 miles from his home and family. It is only fair that GainJet now faces the jurisdictional consequences of its intentional conduct.

## CONCLUSION

The district court's dismissal for lack of jurisdiction was error, and Appellants respectfully urge this Court to reverse and remand for further proceedings. When foreign actors kidnap a Texas resident in Texas, the courts in Texas must be able to assert their authority to protect those within the state's borders.

Respectfully submitted,

**STEVE D. SHADOWEN**
COUNSEL FOR PLAINTIFFS-
APPELLANTS


BY: */s/Steve D. Shadowen*
　　　**STEVE D. SHADOWEN**

Steve D. Shadowen
Tina Miranda
Nicholas W. Shadowen
HILLIARD SHADOWEN LLP
1717 W. Sixth Street,
Suite 290
Austin, Texas 78703
T:  (835) 344-3298
steve@hilliardshadowenlaw.com
tmiranda@hilliardshadowenlaw.com
nshadowen@hilliardshadowenlaw.com

Marion M. Reilly
MARTINEZ  REILLY PLLC
636 South Alameda, Ste. B119
Corpus Christi, TX 78411
T: (210) 903-9677
marion@mrtrial.com

## CERTIFICATE OF SERVICE

I, Steve D. Shadowen, hereby certify that the foregoing brief was electronically filed on the 4th day of November 2024, using the court's CM/ECF system which will provide a notice of electronic filing to counsel of record.

/s/ Steve D. Shadowen
**STEVE D. SHADOWEN**
Counsel for Plaintiffs-Appellants

# CERTIFICATE OF COMPLIANCE

Pursuant to 5th Circuit Rule 32.2.7(c), undersigned counsel certifies that this brief complies with the type-volume limitations of 5th Circuit Rule 32.2.7(b).

1. Exclusive of the portions exempted by 5th Circuit Rule 32.2.7(b)(3), this brief contains 12,298 words printed in a proportionally spaced typeface.

2. This brief is printed in a proportionally spaced, serif typeface using Times New Roman 14 point font in text and Times New Roman 12 point font in footnotes produced by Microsoft Office Word 2019.

*s/ Steve D. Shadowen*
**Steve D. Shadowen**
Attorney for Plaintiffs-Appellants

November 4, 2024
**DATE**